NOT FOR PUBLICATION                                                      (Doc. No. 46)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY
# CAMDEN VICINAGE

| | |
|---|---|
| ANDREW S. MILLER, | |
| Plaintiff, | |
| v. | Civil No. 1:12-cv-01004 (RBK/JS) |
| DENNIS BUTLER, | **OPINION** |
| Defendant. | |

**KUGLER**, United States District Judge:

This matter comes before the Court on the motion of Andrew Miller ("Plaintiff") for partial summary judgment. For the reasons expressed herein, Plaintiff's motion will be **GRANTED**.

## I. BACKGROUND

In 2005, Plaintiff, through his limited liability company, Miller Energy, entered into an agreement with Dennis Butler ("Defendant") to purchase and resell investments at a profit, forming Miller/Butler, LLC. Plaintiff's Statement of Undisputed Material Facts ("SUMF") ¶¶ 1, 4.[1] The LLC Agreement provided that each member would contribute "[o]ne half of the amounts necessary for each transaction" entered into under the Agreement. Id. ¶ 5. At the time, Plaintiff's business was located in Denver, Colorado, and Defendant's business was located in

---

[1] Because Defendant did not furnish a responsive statement of material facts, as required by Local Rule 56.1, the Court must deem all off Plaintiff's material facts as undisputed. L. Civ. R. 56.1(a). Further, Defendant indicates in his brief that he "has little or no quarrel with the Plaintiff's purported statement of undisputed material facts, as set forth in his Motion." Def. Opp'n at 1.

Marlton, New Jersey.  Sec. Am. Compl. ¶¶ 1-2.  Throughout their business relationship, Defendant identified investments to pursue, while Plaintiff's role what that of an investor.  SUMF ¶¶ 8-9.

In November, 2006, Defendant contacted Plaintiff, and recommended that they purchase a portfolio of Citibank-originated loans together (the "Citi File").  Id. ¶¶ 6, 14.  Defendant was to purchase the Citi File from Matterhorn Financial, a debt acquisition and resale entity that he had transacted several prior deals with, and which is no longer in existence.  Id. ¶¶ 12-13.  Defendant informed Plaintiff that the file could be "flipped" quickly and they could realize a large profit.  Id. ¶ 15.  By way of an email sent on November 14, 2006, Defendant solicited a wire transfer of $168,658.54 from Plaintiff, which would represent half of the purchase price of $337,317.08 for the Citi File.  Id. ¶¶ 20-21.  Plaintiff responded, requesting that Defendant "affirm that this money is also governed by our operating agreement."  Id. ¶ 22.  Plaintiff also requested that Defendant "confirm with me that your money is also wired.  I would like your confirmation that you invested the same amount that I did."  Id. ¶ 23.  Defendant replied to the email, writing "Confirmation Below."  Id. ¶ 24.  In the text of Plaintiff's prior message, Defendant had inserted the word "Confirmed" immediately following Plaintiff's request for confirmation that the investment was governed by the LLC Agreement.  Id.  He also inserted the words "will do" after the sentence where Plaintiff requested confirmation that Defendant had invested the same amount as Plaintiff.  Id.

Plaintiff wired the money, at Defendant's request, to a Bank of America account in Marlton, New Jersey.  Id. ¶¶ 25-26.  The Bank of America account was in the name of "Universal Payment Processing," which was a sole proprietorship owned by Defendant, and used

by him for both business and personal purposes.  Id. ¶ 27.  Defendant did all of his business through the Bank of America account.  Id. ¶ 29.

On November 15, 2006, Defendant contacted Plaintiff by email, telling him that he had not yet competed the Citi File purchase, but that "I plan on finishing this deal today."  Id. ¶ 31.  Plaintiff requested that he be informed when the transaction was closed, and also asked for a copy of the contract and a closing statement.  Id. ¶ 32.  On November 22, 2006, Defendant faxed Plaintiff a copy of an executed Purchase Agreement, indicating a sale of the Citi File from Matterhorn Financial to Miller/Butler LLC.  Id. ¶ 35.  The document sent from Defendant to Plaintiff lists a closing date of November 13, 2006, and a purchase price of $337,318.31.  Id. ¶¶ 36-37.  The Purchase Agreement indicated that if Miller/Butler LLC failed to "fund by November 18, 2006 or purchaser and Seller enter into a new purchase agreement for the same accounts prior to November 17, 2006," the Agreement would be "null and void."  Id. ¶ 38.  No funds were wired out of Defendant's Bank of America account until November 28, 2006, when he transferred $128,836.86 from that account to an escrow account designated by Matterhorn Financial.  Id. ¶ 42.  That transaction is described in Defendant's bank records as "For Purchase of Cit Y Financial."  Id.  Defendant testified that he never used other accounts for file purchases or wire transfers, and no other wire transfers were made out of the Bank of America account for purchase of the Citi File in the weeks before or after November 28, 2006.  Id. ¶¶ 46-47.

Ultimately, the parties were unable to resell or collect on the majority of the Citi File.  Id. ¶ 56.  Plaintiff filed suit, asserting claims for breach of contract, breach of implied covenant of good faith and fair dealing, breach of fiduciary duty, accounting, fraudulent concealment by a fiduciary, equitable fraud, conversion, constructive trust, and unjust enrichment.  Pursuant to an Opinion and Order issued on November 16, 2012, this Court denied a motion filed by Defendant

to dismiss the complaint, rejecting arguments by Defendant that the statute of limitations barred this suit, that Plaintiff lacked standing, and that the Court lacked personal jurisdiction over Defendant. See ECF Doc. No. 20. Pursuant to an Opinion and Order dated January 15, 2014, this Court denied a motion filed by Defendant for summary judgment based upon the assertion that Plaintiff's claims were time-barred by application of Colorado's statute of limitations. See ECF Doc. No. 51.

## II.     LEGAL STANDARD

The court should grant a motion for summary judgment when the moving party "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "material" to the dispute if it could alter the outcome, and a dispute of a material fact is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Matsushida Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'") (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 289 (1968)). In deciding whether there is any genuine issue for trial, the court is not to weigh evidence or decide issues of fact. Anderson, 477 U.S. at 248. Because fact and credibility determinations are for the jury, the non-moving party's evidence is to be believed and ambiguities construed in its favor. Id. at 255; Matsushida, 475 U.S. at 587.

Although the movant bears the burden of demonstrating that there is no genuine issue of material fact, the non-movant likewise must present more than mere allegations or denials to successfully oppose summary judgment. Anderson, 477 U.S. at 256. The nonmoving party must at least present probative evidence from which the jury might return a verdict in his favor. Id. at

4

257. The movant is entitled to summary judgment where the non-moving party fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

### III. DISCUSSION

Plaintiff moves for summary judgment on his claims for breach of contract, breach of fiduciary duty, and fraud. The Court finds that Plaintiff is entitled to summary judgment on his theory of breach of contract, and because these claims are asserted in the alternative, it is not necessary to discuss the other claims.

**A. Choice-of-Law**

Here, Plaintiff was a citizen of Colorado, and Defendant was a citizen of New Jersey at the time of the transaction involving the Citi File. Although Defendant has suggested that Colorado substantive law should apply in his brief, he has not set forth any conflict between the laws of the two states as to breach of contract. [2] However, it is necessary to first resolve the issue of which state's law applies. The Court finds that as to the breach of contract claim, no conflict exists between Colorado law and New Jersey law.

In a diversity case, a federal court will apply the conflict of law rules of the forum state in order to determine which state's substantive law to apply. Bayer Chems. Corp. v. Albermarle Corp., 171 F. App'x 392, 398 (3d Cir. 2006). Under New Jersey's conflict-of-law principles, the first step in a choice-of-law analysis is determining whether an actual conflict exists between the laws of the two states. Kramer v. Ciba-Geigy Corp., 371 N.J. Super 580, 597 (App. Div. 2004).

---

[2] The Court determined in its Opinion in deciding Defendant's summary judgment motion that there is no global choice-of-law clause selecting Colorado law that would apply to the dispute over the Citi File. See Opinion of Jan. 15, 2014, ECF Doc. No. 51, at 5. The Court also found that the Colorado statute of limitations did not apply. Id. at 6. However, it was unnecessary to reach the issue of what substantive law applies in connection with that motion.

"Any such conflict is to be determined on an issue-by-issue basis." Id. at 598 (citing Veazey v. Doremus, 103 N.J. 244, 248 (1986)). If there are no relevant differences between the states' laws, the Court can refer to the state laws interchangeably. See Hammersmith v. TIG Ins. Co., 480 F.3d 220, 230 (3d Cir. 2007).

In Colorado, the elements of a claim for breach of contract are (1) "the existence of a contract"; (2) "performance by the plaintiff or some justification for nonperformance"; (3) failure to perform the contract by the defendant"; and (4) "resulting damages to the plaintiff." Western Distrib. Co. v. Diodosio, 841 P.2d 1053, 1058 (Co. 1992).

Similarly, the elements of a breach of contract claim under New Jersey law are that (1) "a contract existed between the parties"; (2) the defendant "breached a duty imposed by the contract," (3) the plaintiff "performed its obligations under the contract," and (4) the plaintiff "was damaged as a result" of the breach. King v. GNC Franchising, Inc., Civ. No. 04-5125, 2007 WL 1521253, at *2 (D.N.J. May 23, 2007). Because there is no meaningful difference between the laws of the two states, it is unnecessary to inquire further into this issue. Where no relevant difference exists between the laws of the two states whose laws might apply, there is "a false conflict" that renders it unnecessary to determine "which state's interest is paramount." Muller v. Parke Davis, 252 N.J. Super. 347, 355 (App. Div. 1991).

### B. Breach of Contract Claim

There is no genuine dispute of material fact as to any of the elements of breach of contract. The first element is existence of a contract. Defendant does not argue that no valid contract existed between the parties, and the evidence indicates that one did in fact exist. Defendant sent an email to Plaintiff on November 14, 2006, soliciting an investment in the Citi File for a "[f]inal purchase price [of] $337.317.08 or $168,658.54 each." Certif. of Christine M.

Pickel, Ex. F.  Plaintiff subsequently responded by email indicating that he would agree to invest in the Citi File.  Id. Ex. G.  He then wired $168,658.54 to Defendant's Bank of America account.  Id. Ex. I.  The details of this transaction, which are undisputed by Defendant, meet the requirements for formation of a valid contract.  See Big M, Inc. v. Dryden Advisory Grp., Civ. No. 08-3567, 2009 WL 1905106, at *18 (D.N.J. June 30, 2009) (describing the elements of an enforceable contract in New Jersey as (1) a meeting of the minds, (2) offer and acceptance, (3) consideration, and (4) reasonably certain contract terms).  The wire transfer to Defendant's account also satisfies the element of breach of contract that requires Plaintiff's performance, as there is no indication that Plaintiff had any obligations under the contract other than paying for half of the cost of the purported investment.

Defendant also failed to perform his obligations under the contract, which involved providing half of the capital necessary for the investment, according to the LLC Agreement between the parties that Defendant indicated would govern the investment in the Citi File.  On November 28, 2006, Defendant wired $128,836.86 from the same Bank of America account to an escrow account held by Matterhorn Financial, who Defendant testified was the seller of the Citi File.  Certif. of Christine M. Pickel, Ex. I.  The transaction is described in Defendant's bank statement as "For Purchase of Cit Y Financial."  Id.  No other transfers were made from that account or from any other accounts for the purchase of the Citi File.  Id. Ex. C. at 120:12-15.  If Defendant accepted $168,658.54 from Plaintiff and represented that it was for half of the purchase price of an investment, and then purchased the entire investment without contributing any of his own funds, it would constitute a failure to perform Plaintiff's obligations under the contract, which involved a price of "$168,658.54 each."  Id. Ex. F.

7

Defendant admitted at his deposition that he wired a lesser amount than Plaintiff paid him in order to purchase the Citi File:

> Q. So, Mr. Butler, you receive $168,000 from Mr. Miller for the purchase of this file, and you send out $128,000.
>
> A. Uh-huh.
>
> Q. What happens to the other $40,000?
>
> A. I guess it's sitting in my bank account . . . .

Id. Ex. C., at 101:2-9.

He testified that the only explanation he could think of for why he paid a lesser amount than he represented to Plaintiff is because Matterhorn or one of its brokers may have owed Defendant money, and as a result a credit was deducted from the purchase price of the Citi File. Id. Ex. C., at 70:10-19; 98:21-99:11, 127:21-128:13.  However, Defendant did not testify that this theory rose any higher than speculation.  See id. Ex. C., at 99:4-7 ("I did so much business with Matterhorn and DSB that maybe I had a couple hundred thousand dollars in buybacks that they owed me.  I really don't know.  I really can't recall this.")  At his deposition, the following exchange took place about the theory that he gave value for the investment though a credit owed to him:

> Q: Mr. Butler, so it's your testimony today, as I understand it, that what accounts for the discrepancy between you sending out approximately $130,000 and purchasing a file for $337,000, is that the people you were buying the file from owed you money?
>
> A: That's possible.  I didn't say that's my statement.

Id. Ex. C, at 102:23-103:6.  Defendant also indicated at one point in his deposition that "I just can't even speculate on how much money Matterhorn would have owed me at that point or did

8

they owe me . . . . I don't want to get hung up on that. I don't know that that's the case." Id. Ex. C, at 106:2-7. He also testified that if there were any emails that might have documented such a credit, they would have since been deleted. Id. Ex. C. at 109:13-110:8, 111:13-112:4, 114:9-13.

Now, however, Defendant advances the argument that summary judgment is improper because "no further discovery was undertaken by the Plaintiff to test the assertions of the Defendant" that he obtained the Citi File "on the basis of the payment of part of the purchase price with . . . possible trade credits to which Defendant was entitled." Def. Opp'n at 1. He argues that Plaintiff is not entitled to summary judgment because Plaintiff failed to attempt "any follow up discovery to test Defendant's assertions." Id.

Defendant's argument must fail because he did not actually make any assertions that a credit existed. At most, he speculated that a credit might have existed, and testified that absolutely no proof exists of any credit or other method of payment for the Citi File. Speculation is insufficient to defeat summary judgment. Bonnieview Homeowners Ass'n v. Woodmont Builders, L.L.C., 655 F. Supp. 2d 473, 489 (D.N.J. 2009) (the "non-moving party must offer specific facts that establish a genuine issue of material fact, not just create 'some metaphysical doubt as to the material facts.'") (quoting Matsushida, 475 U.S. at 586). When opposing a summary judgment motion, "speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990); see also Wilkerson v. Armstrong World Indus., Inc., Civ. No. 89-2494, 1990 WL 138586, at *2 (D.N.J. Sept. 19, 1990) ("Speculation is insufficient to establish a material fact on which to base a denial of summary judgment") (citing Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc., 627 F.2d 919, 928 (9th Cir. 1980)).

9

Further, the Purchase Agreement for the Citi File does not support Defendant's position as to the higher purchase price. Although it provides for a price of $337,318.31, it indicates that if the buyer "fails to fund by November 18, 2006 or purchaser and seller enter into a new purchase agreement for the same accounts prior to November 17, 2006, this Agreement will become null and void." Certif. of Christine M. Pickel, Ex. N. The payment made by Defendant on the Citi File was on November 28, 2006, which meant that the Purchase Agreement was void by its own terms. Thus, Defendant can point to no material fact in dispute that suggests that he performed his duty under the contract to invest $168,658.54 of his own funds in the acquisition of the Citi File.[3] Contrary to Defendant's argument, Plaintiff has no obligation to conduct further discovery to disprove speculation about a trade credit. Defendant has had every opportunity to demonstrate that a trade credit existed, if that was the case. Under the Federal Rules, he could have submitted a document or affidavit along with his opposition demonstrating that a genuine dispute of fact exists as to a trade credit, but he failed to do so. See Fed. R. Civ. P. 56(c)(1).

The final element of breach of contract is damages. Plaintiff incurred damages as a result of Defendant's failure to perform his obligations under the contract. If the investment was purchased for approximately $130,000, and was to be a joint investment, he would have only owed half of $130,000, which is significantly less than the $168,658.54 that he actually paid.

Because Plaintiff is entitled to summary judgment on his breach of contract claim, the only remaining issue is damages. In contract law, the usual measure of damages is

---

[3] Defendant also indicated in his interrogatory responses that he paid approximately $200,000 for the Citi File, and wired that amount from his bank account. Pickel Cert., Ex. P, ¶5. Although this averment by Defendant appears inconsistent with his deposition testimony cited in this Opinion, this statement itself would indicate a failure to perform under the contract, when coupled with Defendant's receipt of over $168,000 from Plaintiff, which was purportedly half of the purchase price.

compensatory damages, which puts the injured party in the position he would have been in if the other party performed as promised. Donovan v. Bachstadt, 91 N.J. 434, 444 (1982). This would suggest an award in the amount of the difference between what Plaintiff paid for the Citi File and what he should have paid based on the actual amount the file cost. Id. at 444. However, Plaintiff argues that the Court should use a rescission or restitution standard and return Plaintiff's entire investment.

Defendant does not take a position on what measure of damages should be used in the event that summary judgment is granted. Under New Jersey law, rescission is an equitable remedy and is only available in limited circumstances, such as where fraud, a material breach, or lack of consideration exists. See Merchants Indem. Corp. v. Eggleston, 37 N.J. 114, 130 (1962) ("When a contract is obtained by fraud, the law grants the injured party a choice. He may rescind or affirm."); Herbstman v. Eastman Kodak Co., 68 N.J. 1, 9 (1975) ("Under principles of contract law, rescission was not warranted unless the contractual breach was material") (citing 12 Williston on Contracts § 1455 (3d ed. 1970)); Guimarra v. Harrington Heights, Inc., 33 N.J. Super. 178, 190 (App. Div. 1954) (when "one who has promised to give some performance fails, without his fault, to receive in some material respect the agreed exchange for that performance," rescission is appropriate). Rescission is designed "to restore the parties to the status quo ante and prevent the party who is responsible for the [wrongdoing] from gaining a benefit." Farris v. Cnty. of Camden, 61 F. Supp. 2d 307, 336 (D.N.J. 1999) (quoting Bonnco Petrol, Inc. v. Epstein, 115 N.J. 599, 612 (1989)). Restitution, which Plaintiff also requests, is closely related to the remedy of rescission. See Restatement (Third) of Restitution and Unjust Enrichment § 37, cmt.

A ("This section describes an alternative remedy for breach of contract that is sometimes called "restitution" but is more easily recognized under the name "rescission.").[4]

The Court finds that rescission is appropriate here. Defendant's purchase of the Citi File for more than $200,000 less than he represented to Plaintiff, and without contribution of any of his own funds, constitutes a material breach. A material breach is one that "goes to the essence of the contract." Diskmakers, Inc. v. DeWitt Equip. Corp., 555 F.2d 1177, 1180 (3d Cir. 1977) (quoting Ross Sys. v. Linden Dari-Delite, Inc., 35 N.J. 329, 341 (1961)). When a breach goes to "the essence of a contract, an appropriate measure of damages in an award to the injured party of restitution of any benefit which he has conferred upon the other party." Ed Hackstaff Concrete, Inc. v. Powder Ridge Condominium "A" Owners Assoc., 679 P.2d 1112, 1114 (Co. App. 1984) (citing 5 A. Corbin, Contracts, § 1104 (1964); Restatement (Second) of Contracts § 373 (1981)). A "victim of a misrepresentation has a choice of either rescinding or affirming the contract. If he rescinds, the monies received under the contract must be returned." Cnty. of Morris v. Fauver, 296 N.J. Super. 26, 38 (App. Div. 1996) (rev'd in part on other grounds, 153 N.J. 80 (1998)). The effect of rescission is to return the parties "to their original positions." Id. The purchase price of an investment certainly goes to the essence of the contract, and thus the Court finds that the remedy of rescission is appropriate, and will seek to return the parties to their original positions.

---

[4] Colorado law does not appear to conflict with New Jersey law in this respect either. See Wall v. Foster Petroleum Corp., 791 P.2d 1148, 1150 (Co. App. 1989) ("rescission may be granted if the facts show that there is a substantial breach, that the injury caused is irreparable, or that damages would be inadequate, difficult, or impossible to assess."); EarthInfo, Inc. v. Hydrosphere Res. Consultants, Inc., 900 P.2d 113, 118 (Co. 1995) ("Rescission of a contract normally is accompanied by restitution on both sides.").

Because Plaintiff's claims for fraud and breach of fiduciary duty are pled in the alternative to the breach of contract claim, it is not necessary to discuss the merits of these claims.

### C. Offset and Partial Satisfaction

Defendant has attached exhibits to his brief opposing summary judgment purporting to document payments made from Defendant to Plaintiff. See Def. Opp'n Exs. A-C. The exhibits appear to be bank statements, as well as a check payable to "Andy Miller" in the amount of $795.69. The documents do not indicate on their face what investment they relate to, and they are unaccompanied by an affidavit or other declaration that these payments represent returns on the Citi File, however Defendant asserts in his brief that the exhibits describe payments related to the Citi File.

Although Plaintiff argues that any defense asserting offset or partial satisfaction has been waived, the Court does not find this to be the case. Defendant asserted in his Answer that "monies which were forwarded by Plaintiff to Defendant for the 'Citi File' have been partially repaid to Plaintiff over the course of the past (6) to seven (7) years." Answer to Sec. Am. Compl ¶ 24. Defendant also testified at his deposition that Plaintiff "has received over $35,000 in proceeds from that file." Aff. of Christine M. Pickel, Ex. C, 116:20-21.

At his deposition, Plaintiff indicated that he may have received a return of "less than a few thousand dollars" back on his purported investment in the Citi File. Certif. of Christine M. Pickel, Ex. B, at 13:2-6, 23:8-10. Thus, both parties agree that some amount was paid from Defendant to Plaintiff as a purported return on the investment here at issue. Because they differ as to the amount of the payments, a factual dispute exists as to the amount of the damages. Under the doctrines of restitution and rescission, the wronged party may recover the "value of his

performance alternatively to an award of damages for the breach." Shea v. Willard, 85 N.J. Super. 446, 451 (App. Div. 1964) (citing 5 Corbin on Contracts § 1104)). But rescission is "the undoing of" a contract, and a Court rescinding a contract must "return[] the parties . . . to the very ground upon which they originally stood." Driscoll v. Burlington-Bristol Bridge Co., 28 N.J. Super. 1, 4 (App. Div. 1953). Thus, any monies paid by Defendant to Plaintiff pursuant to the Citi File investment must likewise be returned or set off against the amount of the judgment.

Although an issue of material fact exists as to at least some part of the damages, a Court can enter summary judgment for the amount that is undisputed and allow the case to proceed to trial on any remaining issues. See New Jersey Office Supply, Inc. v. Feldman, Civ. No. 89-3990, 1992 WL 219790, at *13 (D.N.J. Sept. 1, 1992). Plaintiff has shown that he is entitled to recover the value of his performance, which is his initial investment, and thus the Court will enter judgment in this amount, less the amount that may be connected with the Citi File if all inferences are drawn in favor of Defendant. The sum of the amounts included in Defendant's exhibits which could reasonably be interpreted as returns on the Citi file is $69,774.26.[5] Thus, after deducting this amount from Plaintiff's initial investment, the undisputed amount of the initial investment is $98,884.28.[6]

### D.  Prejudgment Interest

---

[5] The three payments are a check for $795.69 (Pl. Opp'n, Ex. A), a wire transfer for $43,812.07 (Id., Ex. B), and a wire transfer for $25,166.50 (Id., Ex. C), the total of which is $69,774.26.

[6] The Court recognizes that Defendant's exhibits are of questionable value, given that they are not authenticated by the affidavit of an individual with personal knowledge as to their significance, and because even Defendant does not identify which payments on the bank statements he submitted are purported returns on the Citi File. See Orr v. Bank of Am., NT & SA, 285 F.3d 764, 773 (9th Cir. 2002) (affirming exclusion of unauthenticated documents for purposes of a summary judgment motion). However, given that both parties testified that some purported return was transmitted to Plaintiff as a result of his investment in the Citi File, the Court finds no other basis upon which to enter judgment at this time for a sum certain that represents the undisputed amount of damages. Judgment in this amount is an alternative form of relief requested by Plaintiff. See Pl. Reply at 7, n.3.

Plaintiff further seeks an award of prejudgment interest. A federal court sitting in diversity applies the law of the forum state with respect to prejudgment interest. Gleason v. Norwest Mortg., Inc., 253 F. App'x 198, 203-04 (3d Cir. 2007). In New Jersey, a court has discretion in a contract action "to award prejudgment interest in accordance with equitable principles." Id. at 204. The "primary consideration in awarding prejudgment interest is that the defendant has had the use, and the plaintiff has not, of the amount in question." Litton Indus. v. IMO Indus., Inc., 200 N.J. 372, 390 (2009) (citing Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 506 (1974)). Courts in this district have routinely awarded prejudgment interest in breach of contract actions where a plaintiff was deprived of funds without receiving that which was promised in return. See Devine v. Advanced Computer Concepts, Inc., Civ. No. 08-875, 2009 WL 78158, at *2 (D.N.J. Jan. 9, 2009).

Except in unusual circumstances, district courts should award interest at the rate set forth in New Jersey Court Rule 4:42-11 when calculating prejudgment interest. See Napp Techs., L.L.C. v. Kiel Labaratories, Inc., Civ. No. 04-3535, 2008 WL 5233708, at *9 (D.N.J. Dec. 12, 2008) (quoting Benevenga v. Digregorio, 325 N.J. Super. 27, 35 (App. Div. 1999)).

New Jersey Court Rule 4:42-11(a) indicates that "for judgments exceeding the monetary limit of the Special Civil Part," prejudgment interest shall be calculated "at the rate provided in subparagraph (a)(ii) plus 2% per annum." Because the judgment in this case exceeds the Special Civil Part monetary limit of $15,000, 2% per annum must be added to the rate provided by subparagraph (a)(ii). N.J. Ct. R. 4:42-11. Prejudgment interest begins to accrue on the date that a defendant is served with process. See Napp, 2008 WL 5233708, at *9. Using this method of calculation, the appropriate amount of prejudgment interest totals $4,510.09.[7]

---

[7] Interest is calculated as follows, using simple interest, which is generally applied by New Jersey courts. See W.R. Huff Asset Mgmt. Co v. William Soroka 1989 Trust, Civ. No. 04-3093, 2009 WL 2436692, at *10 (D.N.J. Aug. 6,

15

## IV.     CONCLUSION

For the foregoing reasons, Plaintiff's motion for partial summary judgment will be **GRANTED**.  Judgment will be entered for Plaintiff in the undisputed amount of his original investment of $98,884.28, plus prejudgment interest of $4,510.09 for a total judgment of $103,394.37.  The Court will hold a status conference for the purpose of designating a trial date for the remaining issues, the date and time of which are set forth in the accompanying order.


Dated:  02/14/2014                                                                    /s/ Robert B. Kugler
                                                                                                ROBERT B. KUGLER
                                                                                                United States District Judge

---

2009). For the year 2012, the interest rate is 2.5% per annum.  2.5% of $98,884.28 is $2,472.11.  That amount divided by 365 days in year, equals the amount of interest per diem, $6.77.  The per diem total is multiplied by 297, the number of days interest accrued in 2012, for a total interest sum in 2012 of $2,010.69.  For the year 2013, since interest accrued for the entire year, the interest rate of 2.25% per annum yields $2,224.90 in total interest. For the year 2014, the per annum interest rate is 2.25%.  2.25% of $98,884.28 is $2,224.90. That amount divided by 365 days, equals per diem interest rate of $6.10. The per diem rate is multiplied by 45, the number of days interest accrued in 2014, for a total interest sum for 2014 of $274.50.  These totals added together equal $4,510.09. See Post-Judgment and Pre-Judgment Interest Rates, Revised November 20, 2013, available at https://www.judiciary.state.nj.us/civil/PostPre-JudgmentRates.pdf.